# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3595-17T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.B.,

     Defendant-Appellant,

and

D.J.,

     Defendant.

_____

IN THE MATTER OF A.B and J.B.,

     Minors.

_____

Argued April 8, 2019 – Decided May 7, 2019

Before Judges Sabatino, Sumners and Mitterhoff.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0223-16.

Richard A. Foster, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Richard A. Foster, of counsel and on the briefs).

Michael A. Thompson, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Michael A. Thompson, on the brief).

Danielle Ruiz, Designated Counsel, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Danielle Ruiz, on the brief).

PER CURIAM

Defendant K.B.[1] appeals from the Family Part's finding she abused or neglected her daughter J.B. For the reasons that follow, we affirm the Family Part's September 28, 2016 order as modified by this opinion.

---

[1] We use initials to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d).

I.

As a preliminary matter, we note that there is an inconsistency between the trial court's oral ruling and written order in this matter. The trial court's September 28, 2016 order states, "[K.B.] used excessive corporal punishment against the child [J.B.] for the reasons stated on the record [on] September 19, 2016." In the September 19, 2016 oral opinion, however, the trial judge expressly declined to make a finding of excessive corporal punishment against K.B., instead finding that K.B. abused or neglected J.B. by unreasonably inflicting harm or allowing harm to be inflicted to J.B. under N.J.S.A. 9:6-8.21(c)(4)(b).

"Where there is a conflict between a judge's written or oral opinion and a subsequent written order, the former controls." Taylor v. Int'l Maytex Tank Terminal Corp., 355 N.J. Super. 482, 498 (App. Div. 2002). Accordingly, we consider the trial court's September 19, 2016 oral ruling to be controlling, and we amend the trial court's order to reflect that the finding of abuse or neglect was entered under N.J.S.A. 9:6-8.21(c)(4)(b). See R. 1:13-1. We thus focus our review on whether the Division of Child Protection and Permanency ("the Division") sustained its burden to prove by a preponderance of the evidence

3

that K.B.'s conduct met the standard for abuse and neglect enunciated in N.J.S.A. 9:6-8.21(c)(4)(b).

## II.

### A.

K.B. is the mother of two daughters, J.B., born in September 2012, and A.B., born in February 2015. K.B.'s former boyfriend, D.J., is the father of A.B. J.B.'s father is unknown.[2]

The Division received a referral regarding concerns of abuse of J.B. on March 5, 2016. On March 4, 2016, defendant's mother and aunt brought J.B., then three years old, to the emergency room at the University Medical Center of Princeton after they noticed redness in both of her eyes and bruising around the left eyelid. They reported to medical personnel that they suspected physical abuse. The examining physician diagnosed J.B. with "bilateral subconjunctival hemorrhage[s]" in both eyes and noted in the discharge report that the family had concerns about physical abuse.

After the hospital notified the Division, the Division sent caseworkers from its Special Response Unit ("SPRU") to examine and interview J.B. on

---

[2] The court ordered paternity testing for D.J. to conclusively determine whether he was the father of J.B. and A.B. Because D.J. did not appear in the litigation, the testing was never completed.

March 5. The caseworkers took several photographs of J.B.'s injuries and interviewed J.B. During the interview, J.B. initially stated that her sister, A.B., caused the injuries, but did not elaborate on how the injuries occurred. J.B. also told the caseworker that D.J., who she referred to as "daddy," stays with her while K.B. is working. J.B. indicated that D.J. had punched her in the chest because she was crying and that she did not like it when D.J. takes care of her.

On March 6, SPRU caseworkers interviewed K.B. K.B. admitted that she was the sole caretaker of J.B. and A.B. She told the caseworkers she first noticed that J.B.'s eye was red before her mother picked the children up on March 4, but did not know when or how the injury occurred. K.B. noted that she leaves the children unattended for short periods of time when she showers. K.B. also noted that she saw A.B. "jab" J.B. in the eye with a credit card, and opined that the hemorrhages might also have resulted from J.B. crying excessively.

The SPRU caseworkers also observed the motel room where K.B. and the children had been residing. The caseworkers noticed men's clothes in the room. K.B. explained that the clothes belonged to D.J., but that she was no longer in a relationship with him and had not seen him since mid-February.

A-3595-17T1

She denied leaving the children in his care and stated that he never disciplined the children.

Based on the interviews of J.B. and K.B., the Division determined that an emergency removal was necessary because K.B. could not plausibly explain how J.B. suffered the injuries.[3] The children were first placed with their maternal grandmother, and later with their maternal aunt.

On March 7, SPRU caseworker Shilpa Malik – who later testified at the fact-finding hearing – located D.J. and spoke with him about the abuse and neglect allegations. D.J. initially stated that he had not seen defendant or the children in over a month, but later admitted he stayed with them in the motel from February 19 to 28, 2016. He neither admitted nor denied hitting J.B., but told Malik that J.B was "always sad" and probably made the allegations against him because she was jealous of the attention K.B gives him. He also

---

[3] The Division's removal of a child without a court order, commonly called a "Dodd removal," is authorized by the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. See N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

admitted to disciplining J.B. and A.B., and "popping"[4] J.B.'s hand on one occasion.

On March 8, the Division contacted the regional Child Protection Center to review J.B.'s medical records and determine the severity and nature of her injuries. Dr. Gladibel Medina reviewed the emergency room medical records, the photographs taken by the SPRU caseworkers, and the DCPP investigation summaries. Dr. Medina did not examine J.B. nor interview any of the parties, because the family was not able to attend an appointment offered that same day.

Dr. Medina issued a report on March 14. The report indicated that the subconjunctival hemorrhaging and bruising "are usually the result of trauma." Dr. Medina rejected that such injuries could result from A.B. poking J.B. with a credit card or from crying. Dr. Medina opined that the injuries could have been caused between a few days to a week prior to the photographs being taken. She opined that K.B. should have at least contacted [J.B.]'s pediatrician for advice if the hemorrhaging was observed suddenly without explanation, and that bruising of this nature does not spontaneously occur from excessive

---

[4] K.B. testified at the fact-finding hearing that "popping" meant tapping the child's hand.

A-3595-17T1

crying. She also noted that the hemorrhages and bruising "remain worrisome for inflicted trauma and child maltreatment (physical abuse)."

On March 8, 2016, the Division filed a verified complaint for custody of the children. The court upheld the emergency removal and granted the Division custody of the children. Thereafter, from March 28 to June 2, 2016, the court continued custody with the Division three times. The court granted K.B. supervised visitation with the children and ordered K.B. to complete a substance abuse evaluation. Although served with the complaint, D.J. never appeared during the litigation.

The Division completed its investigation on May 2, 2016. The Division substantiated K.B. for "Neglect – Substantial Risk of Physical Injury/ Environment Injurious to Health and Welfare" with regard to J.B. The Division substantiated D.J. for physical abuse of J.B.

B.

The trial court held a fact-finding hearing on July 13 and July 14, 2016. The Division first offered the testimony of caseworker Malik. Malik testified regarding the Division's investigation as set forth above. The court admitted the Division's investigation summary into evidence, subject to the exclusion of

A-3595-17T1

any embedded hearsay statements other than statements made by the parties, the children, or Division caseworkers.

Next, for scheduling purposes, K.B. testified out of order on her own behalf. K.B. maintained that she was the sole caretaker for the children when they stayed at the motel and specifically denied that D.J. had stayed with her and the children from February 19 to 28. She testified that the first time she noticed that K.B. had any injuries was on the morning of March 4 after she got out of the shower. There was no blood or bruising in J.B.'s eyes before she got into the shower, but she noticed A.B. swinging a credit card in her arms after she exited the shower. Shortly after, she saw J.B. grabbing at her eye and noticed a "spot" and a "little hemorrhaging" in one eye. K.B. assumed that A.B. had poked J.B. in the eye with the credit card. K.B. did not seek medical attention for J.B.'s eye, but took a picture and sent it to her mother to quell any suspicions of physical abuse. K.B. did not present the picture at the fact-finding hearing.

Dr. Medina then testified. The parties stipulated to Dr. Medina's qualification as an expert in pediatrics and pediatric child abuse. Dr. Medina testified that hemorrhages refer to "blood out of the blood vessels." Referencing the photographs of J.B.'s injuries, Dr. Medina identified

9

hemorrhaging in the lower portion of both of J.B.'s eyes and bruising of the lower eyelid and surrounding skin on both sides, with the bruising more pronounced under the left eye. Based on the color of the bruising and the fact that the maternal grandmother had not reported any injuries the previous weekend, Dr. Medina determined that the injuries could have occurred from a few days up to a week before the photographs were taken. Specifically, Dr. Medina opined that the injuries occurred at least eighteen hours prior to the photographs being taken.

When asked to provide her "professional impression" as to the injuries, Dr. Medina stressed that the bruising and hemorrhages had to be considered together. Dr. Medina noted that subconjunctival hemorrhaging could occur from forceful and constant vomiting or coughing, but that neither coughing nor vomiting would account for the bruising beneath the eyes. She opined that the presence of both injuries "really reflect trauma to the face."

As in her report, Dr. Medina rejected that the injuries could have been caused by A.B. poking J.B. with a credit card, reasoning that a poke could create a single hemorrhage but would not account for the bruising on both sides of the face. On cross-examination, Dr. Medina acknowledged that the child continuously flaring her arms with the credit card and repeatedly hitting

the eyes could account for the redness in both eyes. Similarly, Dr. Medina rejected that excessive crying could account for the injuries, because crying would not account for the bruising. Dr. Medina likewise opined that an impact on a flat surface, such as falling onto the floor or running into a wall, would not account for the injuries because the nose would be bruised and not the inside of the eyes.

When asked to account for other accidental mechanisms by which the injuries could have occurred, Dr. Medina opined that the cluster of injuries could have occurred from the child falling "on a surface full of toys or multiple objects . . . but it has to be impacting the receded areas in [the] face to break [the] blood vessels like that." In such a scenario, additional injuries to other areas of the face would be expected, but the injuries could also be localized. Dr. Medina noted that from her records review, K.B. did not report that J.B. had injured her eyes by falling. In sum, Dr. Medina testified that the statements and conclusions in her report were rendered to a reasonable degree of medical certainty, even though she did not have the opportunity to interview K.B. or examine J.B.

At the conclusion of the fact-finding hearing, the trial judge reserved decision and requested that the parties brief the issue of whether the burden of

11

persuasion should shift to J.B. to establish non-culpability for the child's injuries pursuant to In re D.T.,[5] as requested by the Division. After receiving the briefing and written summations, the trial judge rendered an oral opinion on September 19, 2016.

Initially, the judge found that caseworker Malik testified credibly, based upon her demeanor and the fact that her testimony was consistent with the Division's investigation summary. Likewise, the judge found Dr. Medina's testimony to be credible because she testified candidly and consistently with her report and other credible evidence in the record. On the other hand, the judge found that K.B.'s testimony was not credible because it was inconsistent with statements she previously made to SPRU caseworkers, D.J.'s statements to caseworkers, and the medical report and expert testimony of Dr. Medina.

Turning first to the allegations against D.J., the judge found that the Division had failed to sustain its burden to prove that D.J. abused J.B. The court noted that the Division alleged that the injuries occurred on the morning of March 5, and that Dr. Medina testified that the injuries could have occurred up to a week before. The judge found that there was no credible evidence in

---

[5] 229 N.J. Super. 509 (App. Div. 1988).

the record to support that J.B. was in the hotel room at the time the injuries occurred.

Addressing the allegations against K.B., the judge noted that the Division alleged that K.B. had abused or neglected J.B. under N.J.S.A. 9:6-8.21(c)(4), because J.B's physical condition had been impaired as a result of K.B's failure to exercise a minimum degree of care in providing the child with proper supervision and guardianship by unreasonably inflicting harm or allowing harm to be inflicted. The judge noted that it was not in dispute that J.B. suffered bilateral subconjunctival hemorrhaging and bruising beneath the eyes; rather, the issue was "how the child was injured and if that injury resulted from either an action or inaction on the part of [K.B.], who takes full responsibility when that injury occurred."

In this regard, the trial judge credited Dr. Medina's testimony over K.B.'s testimony:

> The [c]ourt, in accepting Dr. Medina's testimony, finds it is certainly more probable than not, given the lack of any credible explanation to the contrary, the lack of credibility of the mother, the injuries to multiple planes of the face which according to the doctor were caused by multiple trauma, and that no other explanation was put forth by the defendant. This [c]ourt again rejects her testimony and in support of Dr. Medina's testimony that . . . this child suffered unexplained multiple trauma to the face that this

13

> [c]ourt found occurred while in the mother's care, under the mother's sole supervision.

Accordingly, the court found "that either the child was hurt by mom or she allowed the child to be hurt . . . while in her sole care and custody."

In so finding, the court explicitly declined to shift the burden of persuasion to J.B. pursuant to D.T. The court, however, found that Division sustained a prima facie case of abuse or neglect for injuries that occurred when J.B. was in K.B.'s care pursuant to N.J.S.A. 9:6-8.46(a)(2) and Rule 5:12-4(d) based upon the evidence presented at the fact-finding hearing. The court further found that K.B. had failed to rebut the Division's prima facie case because she offered no credible explanations as to how J.B.'s injuries occurred. Accordingly, the judge found that the Division met its burden to prove abuse or neglect as defined in N.J.S.A. 9:6-8.21(c)(4)(b).

As noted above, on September 28, 2016, the trial judge mistakenly entered an order finding that K.B. abused J.B. by inflicting excessive corporal punishment. This appeal followed.[6]

---

[6] On December 4, 2017, the trial court reunified J.B. and A.B. with K.B. in accordance with the Division's recommendation. On March 5, 2018, the trial court dismissed the litigation after K.B had obtained stable housing and completed parenting classes and individual counseling.

A-3595-17T1

III.

It is well-settled that "[a]buse and neglect cases 'are fact-sensitive.'" Dep't of Children & Families, Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 180 (2015) (quoting Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 309 (2011)). We give considerable deference to the family court's factual determinations because it has "the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand . . . [and] a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." Ibid. (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." New Jersey Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552-53 (2014) (quoting Manalapan Realty, LP v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)).

On appeal, K.B. contends the abuse and neglect finding against her must be reversed because the trial judge misapplied Title 9's standards.[7] K.B. asserts that the trial court erroneously "applied a strict liability standard, de facto burden-shifting, and improper consideration of 'circumstantial evidence' in order to reach [the] judgment." Having reviewed the record and governing legal principles, we reject K.B's arguments.

"Title 9 controls the adjudication of abuse and neglect cases." New Jersey Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citing N.J.S.A. 9:6-8.21 to -8.73). "In a fact-finding hearing (1) any determination that the child is an abused or neglected child must be based on a preponderance of the evidence and (2) only competent, material and relevant evidence may be admitted." N.J.S.A. 9:6-8.46(b). In this case, under its theory of abuse and neglect, the Division was required to prove that J.B.'s

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [her] parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or

---

[7] K.B. and the Law Guardian both argue that the evidence was insufficient to support a finding of excessive corporal punishment as defined by case law. As explained above, however, we do not address this argument because the trial court's oral opinion distinctly found abuse and neglect only under N.J.S.A. 9:6-8.21(c)(4)(b).

guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment[.]

[N.J.S.A. 9:6-8.21(c)(4)(b).]

"It is difficult to marshal direct evidence of parental abuse and neglect because of the closed environment in which the abuse most often occurs and the limited ability of the abused child to inculpate the abuser." N.J. Div. of Youth & Family Servs. v. S.S., 275 N.J. Super. 173, 179 (App. Div. 1994). Consequently, in a fact-finding hearing under Title 9,

proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian shall be prima facie evidence that a child of, or who is the responsibility of such person is an abused or neglected child.

[N.J.S.A. 9:6-8.46(a)(2).]

We have characterized this statutory provision as deriving from "traditional res ipsa loquitur principles," whereby the Division receives an inference of abuse or neglect necessary to establish a prima facie case, and "the burden will shift to the parents to come forward with evidence to rebut the presumption of abuse or neglect." Div. of Youth & Family Servs. v. J.L., 400 N.J. Super. 454, 470 (App. Div. 2008). Under this provision, the ultimate

17

burden of proof remains with the Division. Ibid. In this regard, "parents are not obligated to present evidence. They may choose to rest and allow the court to decide the case on the strength of the Division's evidence." Id. at 472.

We have alternatively enunciated a burden-shifting paradigm, otherwise known as conditional res ipsa loquitor, which applies when an identifiable set of individuals had custody of an infant who suffers injuries while in their care. See id. at 468-69 (citing In re D.T., 229 N.J. Super. 509, 517 (App. Div. 1988)). Initially, in D.T., the majority of the panel held that when

> a limited number of persons, each having access or custody of a baby during the time frame when a sexual abuse concededly occurred, no one else having such contact and the baby being then and now helpless to identify her abuser, . . . [t]he burden would then be shifted, and such defendants would be required to come forward and give their evidence to establish non-culpability.
>
> [229 N.J. Super. at 517 (citing Anderson v. Somberg, 67 N.J. 291, 298-99 (1975)).]

See also S.S., 275 N.J. Super. at 181 (applying D.T.'s burden-shifting paradigm). Under this framework, the burden of proof shifts to the caregiver to come forward with exculpatory evidence. See J.L., 400 N.J. Super. at 468-70.

Importantly, D.T.'s burden shifting framework applies only when the facts clearly establish the abuse occurred during a time frame in which a defined number of individuals had access to the child. See New Jersey Div. of Child Prot. & Permanency v. K.F., 444 N.J. Super. 191, 201-204 (App. Div. 2016). The burden of proof should not shift to the caregivers when one caregiver claims sole responsibly for the child's supervision during the relevant time period. Id. at 203. Nor should the burden of proof shift "merely because a trial judge is uncertain regarding the mechanism that caused the child's injury." Id. at 204.

In this case, K.B. contends that although the trial judge stated that he was not applying D.T.'s burden shifting framework, the judge nonetheless imposed a burden on K.B. to prove that she did nothing wrong in relation to J.B.'s injuries. We disagree that the trial judge imposed such a burden. The trial judge correctly rejected the Division's request to shift the burden of proof pursuant to D.T. because there was not an identified set of individuals with access to J.B. during the relevant time period; rather, the trial judge found that the credible evidence in the record supported that K.B. was the sole caregiver for J.B. in the relevant time frame. Instead, the trial judge appropriately relied on N.J.S.A. 9:6-8.46(a)(2) in concluding that the Division had made out a

prima facie case of abuse or neglect, but did not shift the burden of proof to K.B.

Based on Dr. Medina's rejection of various potential explanations for J.B.'s injuries – including excessive coughing, vomiting, or crying; falling on a flat surface or running into a wall; and A.B. poking J.B. with a credit card – as well as her opinion that the inflicted trauma was worrisome for physical abuse, the trial judge reasonably concluded that J.B.'s injuries were of "a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian." N.J.S.A. 9:6-8.46(a)(2). Although Dr. Medina's expert opinion was somewhat limited, the trial judge reasonably found based on Dr. Medina's testimony and other circumstantial evidence in the record that J.B.'s injuries were likely to have occurred only by either an intentional act of abuse or by K.B.'s failure to exercise a minimum degree of care.[8]

---

[8] At one point in the oral decision, the trial judge stated:

> When a child is left in the sole care of one individual and that child is injured, the [c]ourt holds those parties responsible. The Division must demonstrate that the child was injured. The Division must demonstrate the child was in the sole care of those individuals, . . . which they have done in this case.

(continued)

A-3595-17T1

In this regard, we defer to trial judge's credibility determinations and fact-finding, as they are supported by substantial, credible evidence in the record. The judge considered K.B.'s lack of a plausible explanation for J.B.'s injuries to be probative of her gross negligence or recklessness in properly supervising J.B. See New Jersey Div. of Youth & Family Servs. v. A.C., 389 N.J. Super. 97, 114 (Ch. Div. 2006). The judge also appropriately considered the findings in the Division's reports to constitute prima facie evidence of abuse or neglect pursuant to Rule 5:12-4(d). See R. 5:12-4(d) ("The Division . . . shall be permitted to submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants. Conclusions drawn from the facts stated therein shall be treated as prima facie

---

(continued)

We caution that this passage is an oversimplified recitation of the standards under Title 9. To make out a prima facie case under N.J.S.A. 9:6-8.46(a)(2), the Division must prove more than a mere injury; it must prove that the injury would ordinarily result only from either an intentional act or grossly negligent omission by the parent or guardian. See, e.g., E.D.-O., 223 N.J. at 180 ("[T]o be considered abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b), that failure must rise to the level of gross negligence."); J.L., 400 N.J. Super. at 472 (noting that a parent may rebut a prima facie case under N.J.S.A. 9:6-8.46(a)(2) by showing "that the injury could reasonably have occurred accidentally, with or without any acts or omissions on their part."). Nonetheless, the trial court's oral decision repeatedly referred to the gross negligence standard and ultimately held the Division to the appropriate burden.

A-3595-17T1

evidence, subject to rebuttal."); see also New Jersey Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 494-95 (App. Div. 2016).

Moreover, Dr. Medina's testimony was largely unchallenged on cross-examination. Although Dr. Medina acknowledged that repeated impacts from a credit card might cause redness in both eyes, throughout her testimony she maintained that the combination of hemorrhaging and bruising was unlikely to occur in this manner. In this regard, the trial judge reasonably found that the presence of injuries to multiple planes of the face was indicative of an intentional act or a grossly negligent failure to supervise.

For these reasons, we find that the trial court appropriately determined that the Division carried its burden to prove by a preponderance of the evidence that K.B. abused or neglected J.B. Judged against our deferential standard of review, see E.P., 196 N.J. at 104, we will not disturb the trial court's finding that K.B. abused or neglected J.B. by failing to exercise a minimum degree of care by unreasonably inflicting harm or allowing harm to be inflicted to J.B. under N.J.S.A. 9:6-8.21(c)(4)(b).

To the extent we have not specifically addressed any arguments raised by the parties, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed as modified. We direct the trial court to vacate the September 28, 2016 order indicating that K.B. committed excessive corporal punishment, and enter an order indicating that K.B. committed abuse or neglect by failing to exercise a minimum degree of care under N.J.S.A. 9:6-8.21(c)(4)(b).

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3595-17T1